# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# PADUCAH DIVISION
# CASE NO. 5:08-CV-00004-R

**GREEN TURTLE BAY, INC.**                                                    **PLAINTIFF**

v.

**JOSEPH ZSIDO, ELIZABETH ZSIDO,**
**M/V MISS ELIZABETH SUE, her engine, tackle,**
**apparel and furniture, USCG Doc. No. 1117299, and**
**KEY BANK USA, N.A.**                                        **DEFENDANTS**

v.

**CUSTOM STAINLESS STEEL, INC.,**
**JOE ZSIDO SALES AND DESIGNS, INC.,**
**PIVOTAL DESIGNS, INC., and**
**ACE AMERICAN INSURANCE COMPANY**          **INTERVENOR DEFENDANTS**

## MEMORANDUM OPINION & ORDER

This matter is before the Court upon Counter-Defendant Green Turtle Bay, Inc.'s Motion for Summary Judgment on Certain Claims (DN 78). Defendants Joseph Zsido and Elizabeth Zsido, as well as Intervenor Defendants Custom Stainless Steel, Inc., Joe Zsido Sales and Designs, Inc. and Pivotal Designs, Inc. have responded (DN 79), and Green Turtle Bay, Inc. has replied (DN 80). This matter is now ripe for adjudication. For the reasons that follow, Green Turtle Bay, Inc.'s Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

This case arises from a dispute over modifications made by Green Turtle Bay, Inc. ("GTB") to a 2000 Carver 506 motor yacht ("Vessel") owned by Joe and Elizabeth Zsido. GTB operates a full service marina, boatyard and condominium resort on Kentucky Lake at Grand Rivers, Kentucky. Joe Zsido designs and manufactures stainless steel products for recreational boats. In August 2007, Mr. Zsido signed an Estimate to have GTB make modifications to the

Vessel and repaint the hull. GTB estimated the repairs would cost $40,000.00.

When GTB began working on the Vessel, GTB removed it from the Zsidos's boat slip and placed it in GTB's boat works facility. On November 21, 2007, GTB returned the Vessel to the slip. Immediately thereafter, Mr. Zsido discovered two unsatisfactory conditions with the Vessel. First, the air conditioning water discharge hoses were emptying improperly, causing the Vessel to take on water. Second, Mr. Zsido states there was substantial paint overspray in the Vessel's interior. GTB re-routed the discharge hoses and attempted to clean the interior to Mr. Zsido's satisfaction. GTB corrected the hose problem but there was significant disagreement between Mr. Zsido and GTB regarding the cleanup effort.

After Mr. Zsido refused to pay GTB for the modifications and painting, as well as sign a release of all liability, GTB asserted a maritime lien against the Vessel and an *in personam* claim against the Zsidos for the costs of the work. The vessel was arrested upon Court order, but was released when the Zsidos posted security. The Zsidos and their insurance company, Ace American Insurance Company ("Ace"), subsequently had the vessel moved to Aqua Yacht Harbor ("Aqua") in Iuka, Mississippi. Mr. Zsido then hired Aqua to clean and repair the Vessel.

The Zsidos have asserted several cross-claims against GTB. They claim that as a result of GTB's conduct, they have sustained loss of use damages amounting to approximately $225,000.00 in lost charter income. Prior to having GTB modify the Vessel, Mr. Zsido signed a "Leasing Agreement" on behalf of himself and Mrs. Zsido, d/b/a/ Joe Zsido Charters, to charter the Vessel to Joe Zsido Sales and Designs, Inc. ("Sales & Designs") for 36 months, commencing on June 1, 2007 and terminating on May 31, 2010. Sales & Designs designs equipment manufactured by an affiliated company, Custom Stainless Steel, Inc. ("Custom"), and sells such

2

equipment to boat manufacturers.

The charter provides for Sales & Designs to use the Vessel as a prototype and display for various products. Specifically, the Vessel was going to be equipped with "the Sport Tower," a device developed by Mr. Zsido, consisting of a command chair that sits on a customized platform on top of a vessel and that incorporates electronic controls by which the operator in the command chair can navigate the vessel. Because the Vessel was not able appear in various boat shows and promote the Sport Tower, Custom claims it has lost profits. Additionally, Mr. Zsido and Sales & Designs split a ten percent royalty based on Custom's sales. A third company, Pivotal Designs, Inc. ("Pivotal"), which sells and markets products manufactured by Custom to retail dealers, also claims damages based on what it would have earned on the sales of the Sport Tower.

Mr. Zsido is President and sole owner of Sales & Designs, President and managing owner of Custom, and President and managing owner of Pivotal (collectively referred to as "Zsido's Companies"). GTB argues that Zsido's Companies cannot recover economic loss based upon the alleged detention of a boat they do not own or have a proprietary interest in. Consequently, GTB contends it is entitled to summary judgment on the counterclaims made by Zsido's Companies. GTB also seeks summary judgment on the Zsidos's claim for loss of use damages, arguing that they did not suffer actual loss.

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In

determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

### I. Intervenor Defendants' Counterclaims

#### A. Breach of Contract

In Count One of the Intervening Counterclaim, Zsido's Companies allege that as third party beneficiaries of the contract between the Zsidos and GTB they have sustained damage from the loss of sales they would have otherwise made had GTB returned the Vessel, undamaged, to the Zsidos in a timely fashion. GTB asserts that a maritime claimant cannot recover economic damages absent physical impact or injury to property it owned or in which it

4

had a proprietary interest, citing *Robins Dry Dock Repair Co. v. Flint*, 275 U.S. 303 (1927). Furthermore, GTB states that only a non-owner who is a "bareboat charterer" has the proprietary interest necessary to recover economic damages, and Sales & Designs was not a bareboat charterer. GTB also states that neither Custom nor Pivotal have the necessary proprietary interest in the Vessel to recovery economic damages.

Under maritime law, *Robins Dry Dock* prohibits recovery for economic loss absent physical damage to a proprietary interest. 275 U.S. at 309. The facts of the case are somewhat similar to the present matter. Flint chartered a ship and agreed with the ship's owners to have the ship docked for repairs every few months. *Id.* at 307. The owners contracted with the dry dock for the repairs. *Id.* at 308. While the ship was docked, Flint agreed not to use the ship in exchange for being excused from paying rent. *Id.* at 307. The dry dock negligently repaired the ship's propeller, delaying repairs and causing Flint to lose use of the ship for two weeks. *Id.* The Supreme Court held that Flint could not sue for loss of use during the delay. *Id.* at 309. Justice Holmes explained that "as a general rule, at least, a tort to the person or property of one man does not make the tort feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong." *Id.*

Although it has been criticized, *Robins Dry Dock* remains good law. *See, e.g.*, *Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50, (1st Cir. 1985) (adhering to *Robins Dry Dock* rule); *State of Louisiana v. M/V TESTBANK*, 752 F.2d 1019, 1022 (5th Cir. 1985) (applying *Robins Dry Dock*); *Reserve Mooring Inc. v. Am. Commercial Barge Line, LLC*, 251 F.3d 1069, 1072 (5th Cir. 2001) ("[P]hysical injury to a proprietary interest is a prerequisite to recovery of economic damages in cases of unintentional maritime tort."); *In re Cleveland Tankers, Inc.*, 791

5

F. Supp. 669, 671 (E.D. Mich. 1992) (following *Robins Dry Dock* rule). The Court is therefore bound by the rule that recovery for economic loss in maritime tort cases is prohibited, absent physical damage to a proprietary interest. *See, e.g.*, *United States v. Martin*, 526 F.3d 926, 941 (6th Cir. 2008) ("'Unless and until the Supreme Court takes the next step, [this Court is] bound to follow its current statement of the law on this subject.'"); *Nautilus Marine, Inc. v. Niemela*, 170 F.3d 1195 (9th Cir. 1999) ("Founded as it is in a decision of the Supreme Court, the *Robins Dry Dock* rule is not for this court to change.").

Applying *Robins Dry Dock*, the Court must determine whether any of Zsido's Companies had the necessary proprietary interest to recover for economic loss. The Court finds that they did not. First, there is no evidence that Custom or Pivotal had any proprietary interest in the Vessel. Their only connection to it is based upon an allegation that Sales & Designs was unable to market the Sport Tower and consequently all three companies suffered. Second, the Court finds that Sales & Designs does not have the necessary proprietary interests in the Vessel because it did not have a bareboat charter.

"A 'charter' is an arrangement whereby one person (the 'charterer') becomes entitled to the use of the whole of a vessel belonging to another (the 'owner'). There are essentially two types of charters: the voyage or time charter and the bareboat or demise charter." *Walker v. Braus*, 995 F.2d 77, 80 (5th Cir. 1993). While generally a non-owner would be barred from recovery for economic loss by *Robins Dry Dock*, "a bareboat charterer ha[s] a sufficient proprietary interest in the damaged property to state a cause of action for its economic losses." *Int'l Shipbreaking Ltd. v. Smith*, 44 F. App'x 653 (5th Cir. 2002) (citing *Bosnor, S.A. de C.V. v. Tug L.A. Barrios*, 796 F.2d 776 (5th Cir. 1986)).

6

"A bareboat charterer stands in the shoes of the owner of the vessel for the duration of the charter and is responsible for managing and maintaining the ship; the shipowner merely retains a right of reversion." *Bosnor*, 796 F.2d at 783. A bareboat charter "constitutes the only form of charter that purports to invest temporary powers of ownership in the charterer." *Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 182 (5th Cir. 1981). Bareboat charters "are created when 'the owner of the vessel . . . completely and exclusively relinquish[es] possession, command, and navigation thereof to the demisee. [They are] therefore tantamount to, though just short of, an outright transfer of ownership." *McAleer v. Smith*, 57 F.3d 109, 113 (1st Cir. 1995) (quoting *Guzman v. Pichirilo*, 369 U.S. 698, 699-700 (1962)). "[A]nything short of such a complete transfer is a time or voyage charter party or not a charter party at all." *Guzman*, 369 U.S. at 700.

On the other hand, "in a time charter the owner fully equips and maintains the vessel, makes repairs as needed and provides insurance on the vessel." *Walker*, 995 F.2d at 81. Often "the principal purpose of a time or voyage charter is to move cargo owned by the charterer or to transport people who are employed by or performing work for the charterer." *Id.* In such cases, "the vessel owner retains possession and control of the vessel; provides whatever crew is needed and is responsible for normal operating expenses." *Id.*

The Court finds that Sales & Designs was not a bareboat charterer. While its leasing agreement with the Zsidos does not have all the typical characteristics of a time or voyage charter, the Zsidos did not completely and exclusively relinquish control of the Vessel, just short of an outright transfer of ownership. The lease provides that the Zsidos "shall be responsible for all regular maintenance with regard to the leased property; [they] shall pay for all home port expenses and shall be responsible for all insurance with regard to the leased property."

Importantly, Mr. Zsido was in possession of the Vessel after the lease agreement was in effect and, like the owner in *Robins Dry Dock*, agreed in his personal capacity to have GTB make modifications to the Vessel. Sales & Designs also has not paid rent to the Zsidos while the Vessel has been docked. For these reasons, Sales & Designs does not have sufficient proprietary interest in the Vessel to overcome *Robins Dry Dock* and maintain a breach of contract claim against GTB directly.

### B. Tortious Interference

In Count Two of the Intervening Counterclaim, Zsido's Companies allege that GTB intentionally interfered with the use of the Vessel by Sales & Designs, causing all of Zsido's Companies to lose revenue. A maritime claimant "may not recover for interference with his contractual relations unless he shows that the interference was intentional or knowing." *Dick Meyers Towing Service, Inc. v. United States*, 577 F.2d 1023, 1025 (5th Cir. 1978); *see also Kaiser Aluminum & Chem. Corp. v. Marshland Dredging Co.*, 455 F.2d 957, 958 (5th Cir. 1972). The plaintiff must establish that the tortfeasor both (1) knew of plaintiff's contractual relation and (2) intended to interfere with it. *Nautilus Marine, Inc. v. Niemela*, 170 F.3d 1195, 1197 (9th Cir. 1999).

Here, there is no evidence that GTB even knew of the charter agreement between the Zsidos and Sales & Designs, much less that it intentionally interfered with it. Furthermore, there is no evidence of a contract between Custom or Pivotal with the Zsidos that GTB could have interfered with. Thus, Count Two of the of the Intervening Counterclaim fails.

In sum, GTB is entitled to summary judgment in its favor on all counterclaims made by

Zsido's Companies in their Intervening Counterclaim.[1]

## II. Zsidos's Claim for Loss of Use Damages Measured by Lost Charter Hire

Finally, GTB contends that the Zsidos cannot prevail on their claim for lost charter hire because their agreement with Sales & Designs does not represent an arm's length transaction and does not give rise to actual loss. Essentially, GTB objects to evidence of lost charter hire as a measure of Zsidos's damages. The Zsidos argue that lost charter hire is an appropriate measure of their loss of use damages.

To recover loss of use damages, a ship owner must prove actual loss with reasonable certainty. *See The Conqueror*, 166 U.S. 110, 125 (1897); *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 379 (5th Cir. 2000). Lost charter hire may be used as a measure of actual loss. *See Snavely v. Lang*, 592 F.2d 296, 298 (6th Cir. 1979) (implying loss of use damages for pleasure boat may be recoverable if due to lost charter hire); *Venore Transp. Co. v. M/V Struma*, 583 F.2d 708, 711 (4th Cir. 1978) (stating starting point for measurement of owner's loss of use damages when vessel is under time charter is lost charter hire); *Maritrans Operating Partners v. Diana T*, No. Civ. A. 97-1916, 1999 WL144458, at *5 (E.D. La. Mar. 15, 1999) ("[W]here a contract for use of the vessel exists, the most direct method of determining the loss of use is the amount of revenue lost under the contract.").

Here, GTB argues that the Zsidos did not suffer an actual loss. It is undisputed that Sales & Designs did not pay the Zsidos to charter the Vessel as it agreed to under the lease. However, GTB reasons that any loss the Zsidos allegedly suffered is illusory because, as sole owner and

---

[1] Count Three (Spoilation) of the of the Intervening Counterclaim was dismissed by order of the Court on August 28, 2008.

9

President of Sales & Designs, whatever Mr. Zsido lost as an owner he saved as a lessee in payments his company did not make: "In other words, any claimed loss of ten thousand dollars per month to the Zsidos was ten thousand dollars saved by [Sales & Designs], which is controlled exclusively by Joe Zsido. The money simply moved or did not move from one Joe Zsido pocket to another Joe Zsido pocket."

In support of its argument, GTB cites the admiralty case *Trade Arbed, Inc v. M/V Swallow*, 688 F. Supp. 1095 (E.D. La. 1988). In that case, steel products were damaged on route from Rumania to various ports in the United States. At one port, the buyer would not accept the steel. The plaintiff, a corporation that imported the steel products for resale in the United States, paid another company to buy the steel on the salvage market in exchange for paying back the plaintiff from the company's initial resales of the product. Due to the lack of evidence of an arm's length transaction, the court found there was no reliable measure of losses for that cargo. *Id.* at 1104. GTB also cites several tax cases to support its argument that the charter agreement between the Zsidos and Sales & Designs cannot be used as evidence of actual loss.

After considering the law and evidence, the Court finds that while GTB may be able to prove the Zsidos did not suffer an actual loss based on lost charter hire, they have not yet done so. The fact that Mr. Zsido signed both sides of the lease, and that he is the sole owner and President of Sales & Designs, does not mandate the conclusion that the loss claimed by him and his wife is merely illusory. Sales & Designs is a separate corporate entity; GTB has not shown that it is just another "Joe Zsido pocket." *Trade Arbed* did not involve analogous facts, nor did the court engage in an in depth discussion of the arm's length transaction principle. The tax cases are also not analogous to the current matter. Therefore, at this time the Court will not bar

evidence of the Zsidos's lost charter hire as a measure of their loss of use damages.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that GTB's Motion for Summary Judgment on Certain Claims (DN 78) is GRANTED IN PART and DENIED IN PART. GTB is entitled to summary judgment in its favor on all counterclaims made by Zsido's Companies in their Intervening Counterclaim, but the Court will not bar evidence of the Zsidos's lost charter hire as a measure of their loss of use damages.